## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| **MICHAEL RAY SCHLATTMAN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 16 C 908** |
| **v.** | ) | |
| | ) | **Magistrate Judge** |
| **NANCY A. BERRYHILL, Acting** | ) | **Susan E. Cox** |
| **Commissioner of Social Security,**[1] | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## ORDER

Plaintiff Michael Ray Schlattman ("Plaintiff") appeals the decision of the Commissioner of Social Security ("Defendant," or the "Commissioner") to deny his application for disability benefits. The parties have filed cross-motions for summary judgment. For the following reasons, Plaintiff's motion is denied [dkt. 15], the Commissioner's motion is granted [dkt. 16], and the Administrative Law Judge's decision is affirmed.

## STATEMENT

### I.    Procedural History

On August 13, 2009, Plaintiff filed an application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act (the "Act"), alleging

---

[1]    Nancy A. Berryhill is substituted for her predecessor, Carolyn Colvin, pursuant to Federal Rule of Civil Procedure 25(d).

disability due to normal pressure hydrocephalus[2] and an array of cognitive impairments, including memory loss, depression, and attention deficit disorder. (R. 172, 223.) After his claim was denied at all stages of the administrative process, Plaintiff appealed to this Court. On January 14, 2014, District Court Judge Milton Shadur vacated the Commissioner's decision and remanded Plaintiff's matter to the Commissioner for new proceedings. (R. 1031–1050; *see Schlattman v. Colvin,* No. 12 C 10422, 2014 WL 185009 (N.D. Ill. January 14, 2014).

The Social Security Appeals Council remanded the case for further proceedings pursuant to the District Court's Order, after which a new Administrative Law Judge ("the ALJ") received additional evidence and held a new hearing on November 13, 2014. (911–994, 1057.) On December 9, 2014, the ALJ issued a new denial of Plaintiff's claim, finding that, although Plaintiff's impairments left him unable to perform his prior work as a product manager, he was not under a disability as defined by the Social Security Act. (R. 860–882.) The Appeals Council then denied Plaintiff's request for review, leaving the ALJ's decision as the final decision of the Commissioner. (R. 841.) It is this second ALJ decision that is currently under review by this Court under 42 U.S.C. § 405(g). *See Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005).

## II.    Factual Background

### A.    Medical History Through First Hearing Date

---

[2]      Normal-pressure hydrocephalus is a condition marked by dilation of the cerebral ventricles due to excess spinal fluid; the condition is often associated with dementia, ataxia (failure of muscle coordination), and urinary incontinence. *Dorland's,* http://www.dorlands.com//def.jsp?id=100050296; https://www.dorlands.com//def.jsp?id=100009861 (last visited January 23, 2017.)

Plaintiff, who was 44 years old when he filed his application, earned a bachelor's degree in business administration then worked for approximately twenty years as a computer hardware broker. (R. 57–59, 233.) After reporting ongoing issues with his memory and balance, Plaintiff underwent a series of neurological tests and scans which, in July 2009, confirmed a diagnosis of normal pressure hydrocephalus. (R. 363–364, 401, 404, 411–417, 426–427, 489, 572–73.) In September 2009, neurosurgeon Thomas Origitano, M.D. surgically installed a shunt into his brain to drain fluid. (R. 514–518.) The shunt subsequently required several adjustments, each resulting in either under drainage or over drainage. (R. 539, 555, 632.) Dr. Origitano replaced the shunt in a second surgery on January 2010. (R. 632–633. 639–642.) This second surgery was successful at relieving Plaintiff's hydrocephalus. (R. 1168, 1188, 1201.) Plaintiff has also experienced sleep difficulties which were treated for some time with a CPAP then more recently with a dental device. (R. 1125–1133.)

Plaintiff underwent three rounds of comprehensive neuropsychological testing with clinical psychologist Dawn Kroencke, Ph.D., the first occurring in the month prior to his September 2009 surgery. Throughout five hours of testing, Plaintiff was cooperative and pleasant, and he diligently and conscientiously performed all of the tasks assigned to him. (R. 482–492.) He displayed no clinically significant problems with his overall cognitive abilities, and his language skills were intact. (R. 482–483.) On the Wechsler Abbreviated Scale of Intelligence (WASI), Plaintiff's scores were in the average range for Verbal, Performance, and

Full Scale IQ. (R. 483.) He scored in the low average range on a test of immediate memory but only in the borderline range in a test of delayed memory. (R. 483.) According to Dr. Kroencke, the discrepancy between the two memory scores implied that Plaintiff could learn new information initially, but that his ability to retain information was poor. (R. 483–484.) He tested in the low average range in auditory memory and in the average range in visual memory, suggesting that he would perform better on tasks involving visual information. (R. 484.) He was able to perform more complex attentional tasks better than he could perform tasks requiring less attention, and he was able to handle distractions. (R. 485.) His emotional status was depressed, with test results suggesting dissatisfaction with his current life and feelings of sadness, which he attributed to his memory problems and financial struggles. (*Id.*) A personality index suggested anxiety, depression, and social withdrawal due to situational stress stemming from his diagnosis. (R. 486.) Dr. Kroencke assigned him a Global Assessment of Functioning ("GAF'") score of 70[3] and suggested that Plaintiff use maps, notes, and other visual cues to aid his memory. (R. 487.) Dr. Kroencke met with Plaintiff and his wife on September 8,

---

[3]     GAF scores reflect a "snapshot" assessment of a patient's severity of symptoms and overall level of social and occupational functioning on a particular day. *Yurt v. Colvin*, 758 F.3d 850, 853 n. 2 (7th Cir. 2014); *Pontarelli v. Colvin,* No. 13 C 1015, 2014 WL 3056616 at 8 (N.D. Ill. 2014). Although the GAF has been abandoned in the most recent version of the Diagnostic and Statistical Manual of Mental Disorders ("DSM V"), it was used in the previous version of that text ("DSM IV"), and is often relied on by doctors, ALJs, and judges in social security cases. *See, e.g., Punzio v. Astrue,* 630 F.3d 704, 710–711. A GAF score of 61–70 is generally indicative of no more than mild symptoms of impairment. *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed. Text Rev. 2000); *see Thomas v. Comm'r of Social Security Admin.,* No. 1:14-cv-00354-SLC, 2016 WL 1237885 at *3 n. 3 (N.D. Ind., March 30, 2016).

2009, to discuss his test results and see how he was faring in the face of his anticipated surgery. (R. 729.)

Plaintiff returned for a repeat evaluation on May 13 and 14, 2010, five months after his second surgery.[4] (R. 736.) This evaluation repeated the same battery of tests that had been performed in August 2009, together with the Continuous Performance Test, a measure of attention. (R. 736, 742.) While Plaintiff's IQ still tested within the average range, his verbal comprehension index had decreased to a statistically significant extent. (R. 737–738.) Additionally, his memory scores had declined significantly. (R. 739–741.) Dr. Kroencke noted that, although he showed statistically significant drops in visual memory, he was still likely to work better with visual than with auditory information. (R. 740.) At the same time, he displayed no significant cognitive dysfunction. (R. 741.) A personality inventory revealed that he was depressed, agitated, and nervous, and that his level of subjective distress appeared to have increased since the surgery. (R. 742.) Finally, the Continuous Performance Test indicated clinical attention deficit suggestive of poor attentional capacity. (R. 742–743.) Dr. Kroencke assigned Plaintiff a GAF score of 51–60[5] and recommended that he undergo individual psychotherapy in order to process his emotions and develop coping strategies. (R. 744.) She opined that he was likely to experience difficulties in novel, complex and changing situations which are reliant on verbal abilities and would require

---

[4]     This second evaluation lists an advanced practicum student and Dr. Kreoencke, supervisor, as the examiners. (R. 736.)

[5]     A GAF score of 51–60 reflects moderate symptoms or moderate difficulty in social or occupational functioning. *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed. Text Rev. 2000).

increased structure and support. She recommended that important information and to-do lists be presented in diagram or picture form. She also stressed the importance of remaining mentally, physically, and socially active with endeavors such as puzzles and group hobbies. (R. 744.) She noted that, depending on the course of his hydrocephalus, a continued decline in cognitive abilities was possible. (*Id.*)

From November 2010 through March 2011, Claimant underwent speech therapy with speech-language pathologist Cindy Burton. (R. 760–802.) Goals of the therapy included developing his auditory and visual processing skills, increasing his attention and memory, and improving his executive functioning with organizing and planning tasks. (R. 766, 779.) Over the course of therapy, he learned to use compensations to assist with processing, attention, and memory. (R. 789–790, 801.) In January, he was helping a friend set up an Excel spreadsheet for a work project, and in February he successfully used the planning and organizing techniques he had been taught to complete a bathroom project . (R. 799.) He acknowledged that, overall, tasks at home were going well. (R. 802.) Plaintiff was discharged from therapy on February 24, 2011, with all but his executive-function goals met. (R. 801–802.)

## B.    Opinion Evidence

On October 27, 2009, state agency reviewer Carl Hermsmeyer, Ph.D. reviewed early portions of Plaintiff's file and diagnosed a nonspecified cognitive disorder that caused him moderate difficulties in maintaining social function;

6

moderate difficulties in maintaining concentration, persistence, or pace; and mild restriction in his activities of daily living. (587–588, 597.) Dr. Hermsmeyer opined that Plaintiff was not significantly limited in most areas of work-related mental functioning. (R. 601–602.) However, he was moderately limited in the abilities to understand and remember detailed instructions, to carry out detailed instructions, and to maintain attention and concentration for extended periods. (R. 601.) Dr. Hermsmeyer opined that Plaintiff retained the mental capacity to perform simple and routine tasks and to perform simple one and two step tasks at a consistent pace. (R. 599, 603.) Medical consultant Calixto Aquino, M.D. opined on November 2, 2009 that Plaintiff had no exertional limitations, but he could never climb ladders, ropes, or scaffolds, could only occasionally balance, and should avoid concentrated exposure to hazards in the workplace. (R. 607–609.) Two other medical consultants later affirmed the findings of Dr. Hermsmeyer and Dr. Aquino. (R. 629.)

On June 11, 2010, a month after his second battery of neuropsychological tests, Dr. Kroencke completed a medical source statement regarding Plaintiff's ability to do work-related activities. (R. 734.) She assessed as "poor or none" his ability to perform the following tasks: remember work-like procedures; understand and remember very short and simple instructions; maintain attention for two hour segments; sustain an ordinary routine without special supervision; perform at a consistent pace without an unreasonable number and length of rest periods; respond appropriately to changes in a routine work setting; deal with normal work stress; be aware of normal hazards and take appropriate precautions; understand

and remember detailed instructions; and deal with the stress of semiskilled and skilled work. His ability to carry out very short and simple instructions was rated as "fair." (R. 734.) At the same time, she opined that Plaintiff had "good" abilities to carry out detailed instructions if they were written; to set realistic goals or make plans independently of others if given enough time; and to accept instruction from supervisors and get along with his coworkers or peers. (R. 735.) He had an "unlimited" or "very good" ability to interact appropriately with the general public and maintain socially appropriate behavior. (R. 735.)

In October 2010, reviewing psychologist David Biscardi, Ph.D. reviewed Plaintiff's file and found that he had only mild restriction of his activities of daily living, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. (R. 754.) He described the findings of the earlier state consultants as "reasonable and consistent with [the medical evidence]"and agreed that Plaintiff "was capable of simple routine competitive work activities." (R. 758.) He found that the objective evidence and Plaintiff's activities of daily living did not support the marked limitations in functioning articulated in Dr. Kroencke's opinion. (*Id.*)

### C.  Additional Medical Evidence

After Plaintiff's first appeal to this Court and subsequent remand of his matter, he submitted additional records to the ALJ. (R. 1125–1162.) Brain scans performed in 2013 and 2014 showed no signs of hydrocephalus. (R. 1188, 1191–1192.) Plaintiff's records include notes from psychiatric mental health nurse

practitioner Christine Dahl, who helped him manage his depression, irritability, and ADD symptoms from October 2011 through July 2012. (R. 1252–1262.) At the time of his initial evaluation in October 2011, Plaintiff still experienced difficulties with memory, focus, and balance, and was frustrated from his inability to do the things he was able to do before his illness. (R. 1259, 1261.) Still, he was doing projects at home and taking his daughters to school every morning. (R. 1262.) Although Ms. Dahl gave him information for state rehabilitative services, Plaintiff did not think he could work. (R. 1262.) In November 2011, Ms. Dahl noted that Plaintiff was "active with 2 part-time jobs, 'books' for a softball team and helping [with] a bowling league." (R. 1258.) In December, she noted that Plaintiff continued performing both "part-time jobs," running household errands, caring for his special-needs child, and preparing for the holidays. (R. 1257.) In January 2012, Plaintiff reported ongoing problems with short-term memory and focus, but was able to drive and could balance his checkbook. (R. 1256.) He stated that an insurance-provided neuropsychological exam[6] had found he could return to work, but he did not want to work due to poor memory and concentration. (*Id.*) In February 2012, he reported that he used reminders on his phone to recall tasks or appointments. (R. 1255.) In March, he confirmed that his memory was still poor, though he was seeing some improvement in concentration, focus, and organization. (R. 1254.) He continued to help the bowling league and to help with household errands and chores. (*Id.*) Ms. Dahl suggested he pursue volunteer opportunities, but he stated he was already too

---

[6]     This exam is not part of the administrative record.

busy. (*Id.*) By July 2012, Plaintiff felt overwhelmed with his disability appeal and financial stress, but was enjoying time with friends and family. (R. 1253.)

Dr. Kroencke, who had last seen Plaintiff three years earlier, met with Plaintiff and his wife for an update appointment on March 7, 2013. (R. 1206.) Plaintiff's wife believed that his cognitive decline had continued. She reported that it was hard for her husband to remember verbal instructions, he needed to write things down and put alarms on his cell phone, he had a worse attention span, his processing speed was slower when answering questions, he was forgetting the names of people with whom he was familiar, and he was making calculation errors when balancing the checkbook. (R. 1206–1207.) Plaintiff endorsed mild to moderate levels of depression and mild anxiety symptoms. (R. 1207.) Dr. Kroencke assigned him a then-current GAF score of 61–70, reflecting mild functional impairment, an improvement from his May 2010 low score of 51–60.

Two weeks later, Plaintiff again completed his third series of cognitive and psychological tests at Dr. Kroencke's office. (R. 1208–1209.) Though testing continued for over four hours with just one break, the examiner[7] observed no signs of concentration or attention problems, testing fatigue, or distress. (R. 1209.) Plaintiff's WAIS test results demonstrated an increase in intellectual level to the "high average" IQ range, an increase that the examiner attributed to a decrease psychosocial stress since his earlier testing. (R. 1209–1210.) Plaintiff's verbal IQ in particular rated in the "superior" range. (*Id.*) His memory scores also showed

---

[7]    Though this third battery of tests was performed by an advance practicum student who then authored the report (R. 1208, 1214), Dr. Kroencke signed the report and is presumed to endorse its findings and recommendations. (R. 1212.)

significant improvement to the average and above-average range, though his response times were variable and slow, suggesting he might have difficulty responding to changing tasks. (R. 1211.) Cognitive tests remained in the average range, with mildly impaired attention abilities and all other cognitive skills intact. (R. 1210.) Dr. Kroencke opined that Plaintiff was "likely to experience difficulties in novel, complex, and changing situations which are reliant on verbal abilities" and would need "increased structure and support." (R. 1212.) The report concluded with recommendations that Plaintiff pursue psychotherapy in order to cope with his stressors, continue to use to-do lists and visual reminders, increase his social outlets, remain physically active, and engage in mentally stimulating activities such as puzzles and card games. (R. 1212.)

In August 2013, Dr. Kroencke reviewed Plaintiff's test results and wrote a letter to his attorney regarding his disability case, but this letter does not appear in the file. (R. 1205.) When Dr. Kroencke met with Plaintiff and his wife the following week to review Plaintiff's test scores, Plaintiff's wife expressed confusion over the increase in his memory scores and expressed concern that these findings would negatively impact his application for disability benefits. (R. 1215.)

### D. Testimony

On March 7, 2010 Plaintiff completed a Function Report in which he averred that he was able to do light housecleaning and laundry, prepare simple meals, pay bills, and use a checkbook. (R. 274–277.) He also provided care for his special needs daughter included feeding, dressing, bathing, changing diapers, and getting her

onto and off of her school bus each day. (*Id.*) He attended church weekly, grocery shopped weekly, went to medical appointments, and occasionally attended his older daughter's sports events. (R. 277–278.) He needed encouragement and reminders to do things, and relied on a pill case to know when to take medicine. (R. 275–276, 278.) He never felt rested, got tired during the day, and sometimes needed to rest, despite sleeping ten to twelve hours a night. (R. 277, 284.) He had an attention span of two to five minutes, could not follow spoken instructions well, and suffered a lack of focus when trying to complete tasks. (R. 279, 281.) He forgot what he was saying when speaking. (R. 281.) Plaintiff also noted that he was easily agitated, more irritable, more argumentative, and less social since his memory loss. (R. 279–280.) He also had problems with balance that affected his standing, walking, and stair climbing. (R. 281.) His wife provided similar information on a Third Party Function Report dated the same day, adding that she often needed to repeat instructions a couple of times for Plaintiff to understand, and he sometimes forgot to pay bills or could not remember if he had paid them. (R. 291, 294.)

Plaintiff's second hearing took place on November 3, 2014 and lasted nearly two hours. (R. 913, 994.) Plaintiff testified that his main problems were with his memory, and that his short-term memory has continued to decline since his surgery. (R. 930–31.) He related that he experienced frustrations in his everyday life, that he had forgotten to get his daughter off the bus multiple times, that he could not be relied on to complete tasks, and that he had a poor sense of time. (R. 933–934.) He also reported experiencing delay and confusion in speaking, and

testified that before the company closed he was put on probation at his job due to getting confused while multitasking. (R. 760, 937, 940–41.) He testified that his depression made him "overly emotional," argumentative, and angry. (R. 942–943.) He stated that he does not want to be around people. (R. 943.)

When asked by the ALJ whether he could perform a job where he "just put widgets in a box" all day, Plaintiff acknowledged he could do such a job on the days he could get there, but that he was likely to call in sick a couple days a week. (R. 934, 952.) He maintained that he had approximately two bad days a week when he was exhausted and went back to bed after getting his disabled daughter ready for school. (R. 935–36.) Plaintiff then expressed frustration at the ALJ's questioning about "menial things," explaining that he had "held a very high job and made good money for many years," had "[paid] into the system" and did not understand why the laws were written such that he could "go flip burgers and that's okay." (R. 939.)

Plaintiff's wife testified that he had two or three bad days per week, but that even on those days he was able to get up and put his special needs daughter on the bus. (R. 966.) She further testified that Plaintiff had problems with his memory and that she called him with reminders to do tasks. (R. 968, 973–74, 977.) He also got upset and frustrated easily. (R. 976.)

A vocational expert ("VE") also testified. He characterized Plaintiff's past work as product manager as a skilled position requiring light exertion. (R. 979.) The ALJ asked the VE to consider a hypothetical person of Plaintiff's age, education, and work experience who could perform work at all exertion levels with no

balancing and no climbing ladders, ropes, or scaffolds, but who was limited to simple, repetitive tasks and the exercise of only simple judgment in jobs with no complex or rapid written communication; no more than simple decision making; no need to come up with creative solutions to novel situations; no more than occasional and minor changes in the work setting; no above-average or highly variable production rates; no public service; only brief and superficial interactions with the public, coworkers, and supervisors; and no teamwork or tandem tasks. (R. 979–981.) The ALJ also specified that the person needed to avoid hazardous work environments, was better at dealing with the concrete than the abstract, and was better dealing with things rather than people. (*Id.*) The VE affirmed that such a person could not perform Plaintiff's past work, but could perform jobs including the unskilled jobs of dishwasher or packer. The VE testified that the reasoning ability required for these jobs was Level 1[8] as defined by the Dictionary of Occupational Titles (which, as Judge Shadur noted in his 2014 remand of this matter, corresponds to a limit to one to two step tasks). (R. 1045.)

---

[8]     This portion of the VE's testimony conflicted with the Dictionary of Occupational Titles ("DOT"). The given DOT code of 318.687-101 corresponds with "kitchen helper," a job that encompasses a variety of tasks including but not limited to dishwashing and requires a reasoning level of 2. However, as discussed in Section II of the Analysis *infra,* the ALJ did not err in excluding a limitation to one to two step tasks from Plaintiff's RFC assessment. Such a limitation would have limited him to jobs at reasoning level 1; his current RFC does not. *See* http://www.occupationalinfo.org/appendxc_1.html#III (last visited January 20, 2017.) As a result, the ALJ's findings did not rely on the VE's mischaracterization of the dishwashing job, and the VE's error had no bearing on the outcome of Plaintiff's matter.

### E.    The ALJ's Decision

The ALJ issued a written decision on December 9, 2014, following the five-step analytical process required by 20 C.F.R. § 416.920. (R. 860–889.) As a preliminary matter, the ALJ found that Plaintiff met the insured status requirements for DIB eligibility through December 31, 2014. (R. 862.) At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since his alleged onset date of July 31, 2009. (*Id*.) At step two, the ALJ concluded that Plaintiff had the severe impairments of normal pressure hydrocephalus status post shunt placement, cognitive disorder, depressive disorder, and attention deficit hyperactivity disorder (ADHD), but that his other impairments were non-severe. (R. 862–863.) At step three, the ALJ concluded that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment. (R. 863.) The ALJ next found that Plaintiff retained the Residual Functional Capacity ("RFC") to perform work at all physical exertion levels, but he could not climb ladders, ropes, or scaffolds; could only work in non-hazardous environments; and needed to avoid concentrated exposure to hazardous machinery. Additionally, he was limited to work involving only simple, routine, and repetitive tasks; no more than simple decision-making; no more than occasional minor changes in the work setting; average production rates but not high or highly variable production rates; no direct service to the public; only brief and superficial interaction with the public, coworkers, and supervisors; no need to devise creative

solutions to novel situations; no need to exercise more than simple judgment; and no need to engage in detailed and rapid communication. (R. 865–866.)

At step four, the ALJ concluded that Plaintiff was unable to perform his past relevant work as a product manager. (R. 881.) At step five, however, the ALJ determined that, in light of Plaintiff's age, education, work experience and RFC, jobs existed in significant numbers in the national economy that he could perform, such as dishwasher or packer. (R. 881–882.) These findings led to the conclusion that Plaintiff was not disabled as defined by the Act. (R. 882.)

## DISCUSSION

### I.      Standard of Review

Section 405(g) provides in relevant part that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Judicial review of the ALJ's decision is limited to determining whether the ALJ's findings are supported by substantial evidence or based upon legal error. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000); *Stevenson v. Chater*, 105 F.3d 1151, 1153 (7th Cir. 1997). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). This Court may not substitute its judgment for that of the Commissioner by reevaluating facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *Skinner*, 478 F.3d at 841; *see also Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008) (holding that the

ALJ's decision must be affirmed even if "reasonable minds could differ" as long as "the decision is adequately supported") (citation omitted).

The ALJ is not required to address "every piece of evidence or testimony in the record, [but] the ALJ's analysis must provide some glimpse into the reasoning behind her decision to deny benefits." *Zurawski v. Halter*, 245 F.3d 881, 889 (7th Cir. 2001). In cases where the ALJ denies benefits, "he must build an accurate and logical bridge from the evidence to his conclusion." *Clifford*, 227 F.3d at 872. The ALJ must at least minimally articulate the "analysis of the evidence with enough detail and clarity to permit meaningful appellate review." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005); *Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2007). "An ALJ has a duty to fully develop the record before drawing any conclusions . . . and must adequately articulate his analysis so that we can follow his reasoning." *See Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005).

## II. The ALJ's RFC Findings Are Supported By Substantial Evidence

Plaintiff challenges the ALJ's RFC finding on two grounds. First, he argues that the ALJ erred in not finding him limited to one to two step tasks. Second, he contends that the ALJ's RFC findings fail to account for his deficiencies in concentration, persistence, and pace. Neither argument is persuasive.

Plaintiff's earlier appeal before this Court was remanded in part because the first administrative law judge's RFC findings, which limited Plaintiff to "simple, routine, repetitive tasks," did not account for a limitation to one to two step tasks, as had been found by one of the agency consultants who had reviewed Claimant's

file. (R. 1045.) The first administrative law judge failed to explain her reason for excluding that particular limitation, leaving the Court to wonder whether that omission "was a conscious decision or a lapse in judgment." (R. 1046.)

In the opinion at issue today, the ALJ directly addressed the Court's concern. He explicitly rejected a limitation to one to two step tasks and provided several reasons for doing so. (R. 860, 877, 880.) First, he relied in part on Dr. Kroencke's observation that Plaintiff actually showed more success at complex attentional tasks than at simpler ones. (R. 875–876.) He also noted that Plaintiff was encouraged by Dr. Kroencke to engage in card games, puzzles, and other stimulating mental tasks to enhance his memory. (R. 880.) In addition, the ALJ reasonably relied on evidence of Plaintiff's ability to complete multistep tasks including household projects, balancing a checkbook, driving, and holding two part-time jobs—doing the "books" for a softball team and helping a bowling team—to support the finding that he retains the capacity to perform multistep tasks. (R. 799, 801, 872, 959.) Therefore, the appropriately supplied substantial evidence to support his finding that Plaintiff is not limited to one to two step tasks.

Plaintiff also contends that the ALJ's RFC assessment fails to account for his difficulties in concentration, persistence, or pace. In the Seventh Circuit, "both the hypothetical posed to the VE and the ALJ's RFC assessment must incorporate all of the claimant's limitations supported by the medical record." *Yurt v. Colvin,* 758 F.3d 850, 857 (7th Cir. 2014); *O'Connor–Spinner v. Astrue,* 627 F.3d 614, 619 (7th Cir. 2010); C.F.R. § 404.1545. "Among the mental limitations that the VE must consider

are deficiencies of concentration, persistence, or pace." *Varga v. Colvin,* 794 F.3d 809, 813 (7th Cir. 2015); *see Stewart v. Astrue,* 561 F.3d 679, 684 (7th Cir. 2009) (hypothetical question "must account for documented limitations of concentration, persistence, or pace"). Because a person's ability to learn a task is not the same as the ability to stick with that task over time, a limitation to "simple, routine tasks" is generally not enough to account for such difficulties. *Taylor v. Colvin*, 829 F.3d 799, 801 (7th Cir. 2016); *O'Connor-Spinner,* 627 F.3d at 619. However, in some circumstances, courts have found that RFC limitations that exclude fast-paced jobs, such as by limiting production rates, can sufficiently accommodate difficulties in concentration, persistence, or pace. *See Smith v. Halter*, 307 F.3d 377, 380 (6th Cir. 2001); *James v. Colvin*, No. 14 C 3345, 2015 WL 5829750, at *9 (N.D. Ill. Oct. 5, 2015); *Ford v. Colvin*, No. 1:14-CV-00731-TWP-MJD, 2015 WL 3604765, at *10 (S.D. Ind. June 5, 2015*); Parson v. Comm'r of Social Security,* No. 4:13-CV-04045-JEH, 2015 WL 3524595, at *6 (CD. Ill. June 3, 2015); *Murphy v. Astrue,* No. 11 831, 2011 WL 4036136 at *12 (N.D. Ill. Sept. 12, 2011); *but see Varga v. Colvin,* 794 F.3d at 815 (given claimant's numerous limitations, an environment "free of fast-paced production requirements" was insufficient.)

At step two of his analysis, the ALJ found that Plaintiff had "moderate difficulties" in concentration, persistence, or pace. (R. 864.) He based this assessment, which mirrored the assessment of the agency consultants, chiefly on Plaintiff's need for reminders to complete tasks and his likely difficulties with "novel, complex, and changing situations." (R. 588, 754, 864.) The record does not

show that Plaintiff has problems with persistence; to the contrary, he endured through testing sessions lasting up to five hours and persisted in completing tasks even when he had passed the time limit. (R. 482.) The ALJ considered this and other substantial evidence in crafting his RFC assessment. He acknowledged that a test of Plaintiff's ability to handle distractions revealed a diagnosis of ADHD, but also described numerous neurological exam notes indicating that Plaintiff displayed normal attention and concentration. (R. 870–871.)

Plaintiff argues that the ALJ did not support his finding that Plaintiff can sustain "average" production rates. Plaintiff bears the burden of proof of proving the extent of his impairments. While his problems with memory and concentration are well-documented, Plaintiff points to no evidence overlooked by the ALJ that would indicate that he would have trouble maintaining an average pace. In sum, the ALJ addressed all relevant evidence and drew a logical bridge to his RFC assessment, which accounted for Plaintiff's documented difficulties in concentration, persistence, or pace by limiting him to simple, routine, and repetitive tasks with few changes in the work setting and no above-average or variable production rates. (R. 865–866.)

## III.   The ALJ Supported His Weighing of the Opinion Evidence

Plaintiff argues that the ALJ erred in rejecting portions of Dr. Kroencke's June 2010 medical source statement. (R. 734–735.) Social Security regulations direct an ALJ to evaluate each medical opinion in the record. 20 C.F.R. § 404.1527(c). Because of a treating physician's greater familiarity with the claimant's condition and the progression of his impairments, the opinion of a

claimant's treating physician is entitled to controlling weight as long as it is supported by medical findings and is not inconsistent with other substantial evidence in the record.[9] 20 C.F.R. § 404.1527(c)(2); *Loveless v. Colvin*, 810 F.3d 502, 507 (7th Cir. 2016); *Clifford v. Apfel*, 227 F.3d at 870. An ALJ must provide "good reasons" for how much weight he gives to a treating source's medical opinion. See *Collins v. Astrue*, 324 Fed. Appx. 516, 520 (7th Cir. 2009); 20 C.F.R. § 404.1527(c)(2) ("We will always give good reasons in our ... decisions for the weight we give your treating source's opinion.").

As an initial matter, the parties dispute whether Dr. Kroencke, who performed two rounds of Plaintiff's comprehensive neuropsychological testing before rendering her opinion, qualifies as a treating source or is merely an examining source. The ALJ found that because she had only evaluated Plaintiff twice and seen him one other time as a "check-in" before rendering her opinion, she was not a treating source. (R. 877.) The ALJ erred in this respect. The definition of "treating source" is broad, and extends to one "who has treated *or evaluated* [the claimant] only or few times or only after long intervals...if the nature and frequency of the treatment or evaluation is typical" for the claimant's condition. 20 C.F.R. § 404.1502 (emphasis added). The definition excludes sources whose treatment relationship arises not from "a medical need for treatment or evaluation" but solely from a need

---

[9]    A recent change to the Administration's regulation regarding weighing opinion evidence will eliminate this rule, commonly known as the "treating physician rule," for new claims filed on or after March 27, 2017. *Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5844, 5848–49 (Jan. 18, 2017) (to be codified at 20 C.F.R. pts. 404 and 416). For the purposes of this appeal, however, the prior version of the regulation applies.

to obtain a report in support of a disability application. Dr. Kroencke evaluated Plaintiff's neuropsychological functioning at the behest of his neurologist in connection with his surgery, re-examined him after a medically-appropriate interval given her role in his health care, and met with him to review her results and recommendations. Because these actions arose from Plaintiff's "medical need for… evaluation," Dr. Kroencke qualifies as a treating source, despite the relative infrequency of her interactions with Plaintiff.

From the determination that Dr. Kroencke is a treating source, however, it does not follow that her opinion need be given controlling weight. A treating source's opinion is entitled to controlling weight only when it is "well-supported" and "not contradicted by other evidence in the record." 20 C.F.R. § 404.1527. The ALJ explained why he did not find Dr. Kroencke's June 2010 opinion to be well-supported, and pointed to extensive evidence that contradicted it. (R. 877.) First, he relied on the opinion of agency consultant Dr. Biscardi, who reviewed the results from both of Plaintiff's neuropsychological testing sessions but expressed a higher opinion of his work-related abilities than did Dr. Kroencke. (R. 758.)

Second, the ALJ cited relied contradictory evidence coming from Dr. Kroencke herself. For example, in an exam dated a few weeks before she completed the June 2010 form, she noted that, while Plaintiff's memory and verbal comprehension had declined since prior to his surgery, his cognitive status scores were otherwise average. (R. 738–739, 876.) The ALJ found those modest findings unsupportive of Dr. Kroencke's low assessment of many of his mental abilities just

22

one month later. (R. 876.) The ALJ also saw an internal conflict in Dr. Kroencke's statements that Plaintiff has a "very good or unlimited" ability to maintain attendance and be punctual within customary tolerances while his ability to sustain an ordinary routine without special supervision was "poor or none." (R. 735, 877.) Similarly, the ALJ observed that, according to Dr. Kroencke, Plaintiff "could not understand or remember very short and simple instructions yet he was not precluded from carrying them out." (R. 877.) He also found that the narrative portion of Dr. Kroencke's report, which opines only that Plaintiff will be limited in novel, complex, and changing situations, is inconsistent with a finding that his ability to perform one to two step tasks is "poor to none." (R. 877.) *See Knight v. Chater,* 55 F.3d 309, 314 (7th Cir. 1995) ("internally inconsistent" medical evidence may be discounted).

The ALJ also found that the GAF scores assigned by Dr. Kroencke, reflecting "mild" to "moderate" symptoms or functional impairment, were inconsistent with her findings that his abilities in numerous areas were "poor to none." (R. 877.) Plaintiff contends that, because Plaintiff was not working at the time, Dr. Kroencke could not have intended his GAF scores to reflect likely occupational impairments. But, as the Commissioner notes, the GAF score, by definition, encompasses occupational impairments. *See* DSM-IV 34 (GAF assesses the "severity of symptoms and overall level of social *and occupational* functioning on a particular day") (emphasis added). Therefore, in assigning him GAF scores of 61–70 and, later, 51–60, Dr. Kroencke opined that Plaintiff's illness would impose no more than mild,

then later moderate, restrictions in his work-related abilities. The ALJ therefore did not err in relying on GAF scores assigned by Dr. Kroencke.

The substantial weight of the evidence that the ALJ marshalled against the most extreme findings in Dr. Kroencke's opinion leads the Court to conclude that, were this matter remanded solely to rectify the mischaracterization of Dr. Kroencke as a non-treating source, the outcome of the matter would be the same. *See Schomas v. Astrue,* 732 F.3d 702 (7th Cir. 2013) (a court "will not a remand a case for further explanation if we can predict with great confidence that the result on remand would be the same.") The ALJ's mischaracterization of Dr. Kroencke as a nontreating source and subsequent decision not to assign her opinion controlling weight is therefore harmless error, and does not mandate remand.

When an ALJ decides for good reasons not to give controlling weight to a treating physician's opinion, he must determine what weight to give to it and other available medical opinions in accordance with a series of factors. These factors include the length, nature, and extent of any treatment relationship; the frequency of examination; the physician's specialty; the types of tests performed; and the consistency of the physician's opinion with the record as a whole. *Yurt v. Colvin*, 758 F.3d at 860; *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009); see 20 C.F.R. § 404.1527(c), 416.927(c). In general, a physician who has personally examined the claimant is given more credence than one who has only reviewed the medical file. 20 C.F.R. § 404.1627(c)(1). An ALJ must provide "sound explanation" for the weight he gives each opinion. *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013). If he does not

discuss each factor explicitly, the ALJ should demonstrate that he is aware of and has considered the relevant factors. *Schreiber v. Colvin*, 519 F. App'x 951, 959 (7th Cir. 2013).

The ALJ's opinion makes it clear that he was aware of and considered each of the relevant factors. First, he noted the relative infrequency of Dr. Kroencke's evaluations of Plaintiff and described in detail each of their interactions, including the type of tests performed in the course of her neuropsychological evaluations. (R. 875–878.) He considered each of Dr. Kroencke's opinion statement and evaluated its consistency with the record as a whole. In fact, he found Plaintiff *more* limited than Dr. Kroencke described in the domain of social functioning, based on the opinions of reviewing psychologists and on Plaintiff's own testimony about his emotional state. The ALJ did not, as Plaintiff contends, replace the psychologist's with his own lay opinion, but instead resolved conflicts in the evidence, including internal conflicts within Dr. Kroencke's opinion, with reference to other record evidence, including the opinions of the reviewing consultants. In sum, the ALJ provided the requisite "sound explanation" for giving minimal weight to Dr. Kroencke's June 2010 opinion but greater weight to her narrative statements and GAF assessments. (R. 870–871, 880.) *See Roddy v. Astrue*, 705 F.3d at 636.

## IV.    The ALJ Did Not Err in Evaluating Subjective Symptom Severity

Plaintiff argues that the ALJ performed a flawed analysis of his credibility by equating his activities of daily living with full-time work. The Social Security

Administration (the "Administration") recently clarified its sub-regulatory policies about symptom evaluation, eliminating the term "credibility" to emphasize that "subjective symptom evaluation is not an examination of the individual's character." *See* SSR 16-3p, 2016 WL 1119029 at *1 (effective March 28, 2016). The underlying regulations and applicable Seventh Circuit law about assessing claimants' statements remain unchanged. 20 C.F.R. § 404.1529; *see also Cole v. Colvin,* 831 F.3d 411, 412 (7th Cir. 2016.)

Under the regulations, when a claimant has a medically-determinable impairment that could reasonably be expected to produce the claimed subjective symptoms, the ALJ must evaluate the intensity and persistence of those symptoms pursuant to objective medical evidence and other evidence. 20 C.F.R. §404.1529(c). Among the evidence to be considered are "the claimant's daily activities, [his] level of pain or symptoms, aggravating factors, medication, treatment, and limitations." *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009) (citations omitted); see 20 C.F.R. § 404.1529(c); SSR 16-3p. An ALJ's credibility determination may be overturned only if it is "patently wrong." *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008). However, the Seventh Circuit has repeatedly cautioned against equating limited or sporadic activity with the ability to perform a full-time job. *Stage v. Colvin,* 812 F.3d 1121 (7th Cir. 2016); *Carradine v. Barnhart,* 360 F.3d 751, 755 (7th Cir. 2004).

At his hearing, Plaintiff testified that, at least twice a week, he experienced "bad days" on which he was capable of little more than lying in bed all day due to exhaustion. (R. 935–936.) However, after a thorough examination of the medical

record, the ALJ could find only one reference to "bad days." (R. 871, citing R. 1233.) That sole treatment note recorded Plaintiff's May 2011 report to his neurologist that he sometimes did not recall how he spent his days, noting that he "may sleep" but was "not sure." (R. 1231, 1233.)[10] Throughout the years of detailed treatment notes from several doctors, a speech therapist, and a mental health nurse practitioner as well as the battery of interviews and tests performed at Dr. Kroencke's office, Plaintiff points to no other evidence of bad days or of spending days in bed.[11] The ALJ concluded that the "consistent findings of normal attention and concentration coupled with the lack of mention of 'bad days' or inability to sustain the performance of tasks significantly diminishes the credibility of the subjective allegations." (R. 871) The ALJ also cited Dr. Kroencke's opinion that Plaintiff could maintain attendance and be punctual within customary tolerances as further evidence supportive of Plaintiff's ability to go to work each day. (R. 879.)

The ALJ next turned to other evidence, including the Plaintiff's daily activities, to evaluate the severity of his symptoms. Plaintiff frequently reported that he was involved in various activities at home and in the community, including household projects and part-time work, once indicating that he was "too busy" to consider volunteering. The ALJ's analysis in this respect was thorough. While explicitly acknowledging that Plaintiff's care for his daughter was not equivalent to

---

[10]     His doctor ordered an EEG to rule out seizures, which she "doubt[ed]" but considered "possible." No evidence of seizures was found.

[11]     Plaintiff's attorney at his hearing reconciled Plaintiff's improved memory scores with his testimony by explaining that Plaintiff also had good days and bad days with respect to his memory. (R. 921–923.) The ALJ then asked whether any other instance in the medical record indicated that Plaintiff ever reported having bad days or mentioned staying in bed all day. The attorney did not point to any such evidence. (R. 926–927.)

an eight-hour-a-day job, he found that Plaintiff's ability to perform that care (even with reminders) suggested that Plaintiff retained the ability to perform routine tasks on a consistent basis. (R. 879.) The ALJ also found that Plaintiff's other numerous and varied activities of daily living "belie[d] an inability to get out of bed or attend work on a regular basis." (R. 879.)[12] The ALJ also relied on some of Plaintiff's more complex daily activities to discount the assertion by Dr. Hermsmeyer that Plaintiff could engage in only one to two-step tasks. The ALJ also found that Plaintiff's claims of inattention were undermined by Dr. Kroencke's observation that Plaintiff was able to sustain attention, concentration, and persistence for four and a half hours. (R. 878–879.) Also, in contrast to Plaintiff's testimony that he had trouble putting his thoughts together, the ALJ observed that Plaintiff was able to "cogently and logically respond to questions and express opinions coherently" through the duration of his hearing. (R. 867.)

In sum, the ALJ's assessment of Plaintiff's activities of daily living did not equate those activities with full-time work. Instead, the ALJ properly focused on whether the overall record, including Plaintiff's daily activities, supported the existence and severity of Plaintiff's claimed work-related limitations. The ALJ based his conclusions on "adequate evidence contained in the record and [explained] why contrary evidence does not persuade," as he was required to do. *Berger v. Astrue,* 516 F.3d 539, 544 (7th Cir. 2008.) His credibility determination is not "patently wrong" and will not be overturned.

---

[12]     This finding lends great support to the ALJ's determination of non-disability, given that Plaintiff admitted that he would be able to perform a simple job ("put widgets in a box") provided he could manage to get to work every day. (R. 934.)

28

## **CONCLUSION**

Undisputed evidence suggests that, prior to his illness, Plaintiff enjoyed a superior memory. (R. 65, "I didn't have to write stuff down, and I could memorize a whole inventory.") Evidence also shows that he lost some significant portion of that ability, a loss which is understandably difficult for Plaintiff and his wife, and suffered other declines in connection with his illness. However, the test for determining disability is not measured relative to the claimant's condition prior to the onset of impairment; it is measured relative to the entire labor market. Therefore, when a claimant can no longer perform his past work, an ALJ completes step five of the analysis to determine whether work exists that the claimant, in his current impaired state, can still do. 20 C.F.R. § 404.1520(a)(4)(v) ("If you can make an adjustment to other work, we will find that you are not disabled.") The ALJ here thoroughly accounted for each of Plaintiff's work-related limitations and determined that jobs exist that Plaintiff can still do. He provided substantial evidence to support each step of his analysis in accordance with applicable law. Those findings will not be disturbed by this Court.

Plaintiff's motion is DENIED and the decision of the Commissioner is AFFIRMED.

**ENTER: 4/10/2017**

_____

**U.S Magistrate Judge, Susan E. Cox**